PER CURIAM.
Radiation Therapy Oncology, P.C. (“RTO”), and the physicians employed by RTO — Dr. Ken Ellingwood, Dr. Greg Cotter, and Dr. Rod Krentel — appeal from a summary judgment entered for Providence Hospital in the Mobile Circuit Court.
I. Facts
A. The Parties
RTO is a private oncology group employing radiation oncologists Dr. Elling-wood, Dr. Cotter, and Dr. Krentel (“the RTO physicians”). The RTO physicians have medical-staff membership and privileges to see patients and to consult with physicians at the three hospitals affiliated with the University of South Alabama— Providence Hospital and Springhill Medical Center in Mobile, and Thomas Hospital in Fairhope.[1]
Providence Hospital (“Providence”) is an Alabama nonprofit corporation that operates a private hospital in Mobile. Providence’s controlling shareholder is Ascension Health. Providence’s corporate purpose, as stated in its articles of incorporation, is to provide “health care to the community it serves, with a special concern for the sick and poor and, to the extent financial resources permit, to provide charity care to persons in need.” From the mid-1980s until 2001, Providence provided an oncology center at the hospital at which the RTO physicians practiced radiation oncology.
Seton Medical Management, Inc. (“Seton Medical”), is an Alabama nonprofit cor *907 poration whose controlling shareholder since 1995 has been Seton Health Corporation of South Alabama, Inc. (“Seton Health”), an Alabama nonprofit corporation whose controlling shareholder is Ascension Health.
Seton Medical owns and operates professional practices for physicians, and it maintains offices for the physicians in those practices on property adjacent to Providence. Seton Medical is what is commonly referred to as an “office-based practice,” because it is a corporation separate from a hospital and operates outside the hospital. In 2001, Providence transferred ownership of its oncology center to Seton Medical. Since the transfer Seton Medical has operated the oncology center as an office-based practice, providing patients an integrated system of cancer care, including medical oncology and radiation oncology, in one office and from one staff.
B. Providence’s Corporate Authority
Providence’s articles of incorporation provide that “[t]he business, property, and affairs of the Hospital shall be managed and controlled by the Board of Directors in accordance with the policies established by the Corporate Member.” Moreover, the articles allow for corporate bylaws and bylaws pursuant to which any medical staff operates (“the medical-staff bylaws”). The corporate bylaws provide that the business, property, and affairs of Providence shall be managed and supervised by a board of directors (“the board”) and that the board’s powers include the power to approve and recommend the sale or transfer of Providence’s assets. Additionally, Providence’s corporate bylaws state that the medical staff has only “recommendation” authority as to appointments, granting or reducing clinical privileges, disciplinary actions, matters relating to professional competency, and certain other matters. Indeed, the corporate bylaws provide that the board must approve any proposed medical-staff bylaws before those bylaws are effective. The corporate bylaws also provide that the board has final authority on all actions of the medical staff, stating that “[t]he medical staff bylaws must include provisions for a physician to appeal to the Board of Directors as the final authority on actions of the medical staff.”
C. The Medical-Staff Bylaws
The medical-staff bylaws, which the board approved, provide in the preamble that the bylaws “are adopted in order to provide for the organization of the medical staff ... and to provide a framework for self-government” for the medical staff. Those bylaws also provide that the physicians who are part of the medical staff accept their privileges subject to the corporate bylaws. The medical-staff bylaws state:
“Membership is not a right of any person. Membership on the medical staff of the hospital is a privilege that shall be extended only to professionally competent physicians ... and as required by Providence Hospital.”
Additionally, the medical-staff bylaws provide: “[T]he ongoing professional responsibilities of each member of the medical staff include: abiding by the medical staff bylaws and medical staff rules and regulations, and Providence Hospital policies and procedures.” Like the corporate bylaws, the medical-staff bylaws recognize that the medical staff has recommendation authority, while the board has the final authority, on all staffing decisions, including appointment of medical staff, denial of appointments, and revocation of appointments.
The medical-staff bylaws further set out the due-process procedures to be used when the board makes a decision that may adversely affect the exercise of staff privileges at Providence by a physician on the *908 medical staff. The medical-staff bylaws provide that the hearing conducted pursuant to those due-process procedures constitutes a “peer review committee” under the Code of Alabama 1975, and the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 et seq., when it is used to “evaluate[], recommend[], or take[] action based on the competence or professional conduct of an individual physician” and when it “affects or may affect the clinical privileges or membership on the medical staff of any physician.” Additionally, the language in the medical-staff bylaws establishes that it is a physician’s conduct, and not the hospital’s conduct, that is intended to be reviewed or defended under the bylaws.
D. The Board’s Decision to Transfer the Oncology Program
In 1997 or 1998, Providence began considering alternatives to the structure of its then existing oncology program. At the time, services to cancer patients were being delivered from different locations, and the medical-oncology and radiation-oncology departments at Providence were separate and distinct departments. During this period, the relationship between the radiation oncologists and the medical oncologists practicing at Providence was poor.
The board determined that Providence needed to establish an integrated and unified cancer-care center where both radiation-oncology and medical-oncology services would be delivered to patients from one location. The board also determined that it was in the best interest of Providence to employ radiation oncologists who would be dedicated to practicing solely at Providence to eliminate any problem caused by a lack of coverage or delays in rendering patient services.
Over the course of approximately two years, Providence, with the assistance of Cancer CarePoint, an independent cancer-care consulting firm, conducted a study of the oncology program at Providence to determine how the proposed cancer-care center could become the best oncology program and provide the best patient care in the area. The study included a review of oncology-related data and confidential interviews with physicians and staff. Specifically, the consultants from Cancer CarePoint met with the currently practicing radiation oncologists at the hospital (the RTO physicians and Dr. Michael Meshad and Dr. Thaddeus Beeker) as well as with hospital administrators, support staff, and other physicians connected with the cancer center to gather information upon which to base the decision.
As a result of the study, Providence and Cancer CarePoint identified several issues facing Providence’s oncology program, including the dysfunctional relationship between the medical oncologists and the radiation oncologists, complications arising out of the fact that RTO was operating competing cancer-care centers, the fact that the medical staff had multiple employers, the lack of standard protocol, and inefficient staffing, scheduling, and usage of space.
After considering several options, including the possibility of RTO’s establishing an oncology staff dedicated solely to work at Providence, the board in January 2001 decided it would be in the best interest of the hospital and its patients to transfer the entire oncology program from within Providence’s province to Seton Medical to establish an office-based practice dedicated to high-quality patient care. One major factor the board considered in deciding to transfer the program, including medical and support personnel and assets, to Seton Medical was the federal Medicare regulations adopted in 2001, which provided for more generous reimbursement of *909 charges in an office-based practice than in a hospital-based practice. Additionally, the board determined that the transfer would provide central control over the scheduling of oncology services, that it would provide better coordination of those services and more efficient delivery of patient care,. and that it would enhance patient and physician convenience.
On February 1, 2001, all radiation oncologists with privileges at Providence were notified of the board’s decision and were given an opportunity to request a hearing at which they could present their position on the transfer. The RTO physicians requested a hearing before the fair-hearing panel to address “whether the actions of the administration are reasonable and warranted under the circumstances.”
On April 23, 2001, the fair-hearing panel conducted a hearing.[2] Providence presented evidence indicating that the board’s decision to transfer the oncology program to Seton Medical was a business decision based on quality-of-care concerns and a need to integrate cancer-care services. The RTO physicians contended that the board’s decision was unrelated to quality-of-care concerns and that it was instead motivated by the unsubstantiated belief that the RTO physicians were not providing sufficient coverage at the hospital and/or that Dr. Cotter, one of the RTO physicians, was acting in an unprofessional manner. After reviewing the evidence and testimony, the fair-hearing panel concluded that the transfer to Seton Medical of the management and operation of the radiation-oncology department of Providence adversely affected the clinical privileges of the RTO physicians.
On May 18, 2001, the board received all of the testimony, exhibits, and other materials presented to and considered by the fair-hearing panel. On May 25, 2001, the board held a special meeting to consider the panel’s decision that the transfer was not in the best interest of the RTO physicians. The board reviewed the panel’s decision using the same evidence presented to the panel and based its decision on criteria considered by the panel. After careful consideration, the board concluded:
“WHEREAS, the Board believes that the business decision to create a unified cancer services delivery system is in furtherance of quality care; ...
“BE IT RESOLVED: That upon careful consideration of the criteria related to overall quality of care contained in the testimony, exhibits and other materials considered by the Fair Hearing Panel, the Board disagrees with and denies the decision of the Fair Hearing Panel and reaffirms the Board’s resolution adopted on January 19, 2001, regarding authorization of the transfer of the Hospital’s cancer program to Seton Medical Management, Inc., and related matters.”
The transfer of the oncology program occurred on August 7, 2001.
On August 20, 2001, RTO and the RTO physicians filed a complaint in the Mobile Circuit Court alleging that Providence had breached the medical-staff bylaws, which, RTO and the RTO physicians argued, created a contract between Providence ánd its organized medical staff. The complaint specifically alleged that the transfer of the oncology program to Seton Medical was a sham and that it harmed RTO in that the RTO physicians were being denied access to oncology equipment necessary to maintain their practice. The complaint further alleged that Providence, by transferring the oncology program, and Seton Medical, *910 by accepting it, had interfered with the contractual relationship between the hospital, the physicians, and their patients.
On July 1, 2003, Providence and Seton Medical moved for a summary judgment as to all counts of the complaint. At the hearing on the summary-judgment motion, RTO and the RTO physicians consented to the entry of a summary judgment in favor of Providence and Seton Medical as to the tortious-interference claims. The only claim then remaining against Providence was the breach of the medical-staff bylaws.
On August 12, 2003, the circuit court entered a summary judgment for Providence on the breach-of-the-medieal-staff-bylaws claim. On August 19, 2003, the circuit court entered a final judgment, recognizing RTO and the RTO physicians’ voluntary relinquishment of all other claims. On September 16, 2003, RTO and the RTO physicians filed its notice of appeal with this Court.
II. Standard of Review
“ ‘The standard of review applicable to a summary judgment is the same as the standard for granting the motion, that is, we must determine whether there was a genuine issue of material fact and, if not, whether the movant was entitled to a judgment as a matter of law.’ ” Southeast Cancer Network, P.C. v. DCH Healthcare Auth, Inc., 869 So.2d 452, 456 (Ala.2003) (quoting Brewer v. Woodall, 608 So.2d 370, 372 (Ala.1992)). “In order to defeat a properly supported motion for a summary judgment, the nonmoving party must present substantial evidence that creates a genuine issue of material fact. ‘[SJubstan-tial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).” George v. Raine, 895 So.2d 258, 261 (Ala.2004). “Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and resolve all reasonable doubts against-the movant.” Southeast Cancer Network, 869 So.2d at 456.
III. Issues and Analysis
First, RTO and the RTO physicians contend that the trial court erred in entering a summary judgment for Providence on the breach-of-the-medical-staff-bylaws claim because, they say, a genuine issue of material fact exists as to whether the board violated the medical-staff bylaws when it disregarded the decision of the fair-hearing panel.
Section 10-3A-34, Ala.Code 1975, in the chapter headed “Nonprofit Corporations,” states that “[a]ll corporate powers shall be exercised by or under the authority of, and the business and affairs of a corporation shall be managed under the direction of a board of directors_” Moreover, § 10-3A-20 states:
“Each corporation shall have the power:
[[Image here]]
“(5) To sell, convey, mortgage, pledge, lease, exchange, transfer and otherwise dispose of all or any part of its property and assets.
[[Image here]]
“(17) To have and exercise all powers necessary or convenient to effect any or all of the purposes for which the corporation is organized.”
An application of the foregoing statutory law to the facts of this case clearly establishes that the board did not violate the medical-staff bylaws in declining to follow the decision of the fair-hearing panel. Providence’s corporate bylaws specifically authorize the board to make business decisions for the hospital, including transferring assets and reorganizing a department. *911 The medical-staff bylaws specifically provide that the physicians who are part of the medical staff accept their privileges subject to the corporate bylaws and that the responsibilities of those physicians include “abiding by Providence Hospital policies and procedures.” The medical-staff bylaws further recognize that the medical staff has the authority to offer recommendations, while the board has the final authority on all staffing decisions. Thus, the medical staff does not have the power or right to ■ overrule a valid business decision made by the board.
Moreover, we note that Providence provided the RTO physicians with due process by permitting them to express at a hearing their position on the transfer of the oncology program. The determination by the fair-hearing panel, however, was merely a factor for the board’s consideration. Thus, the RTO physicians were afforded a hearing at which to express their position regarding Providence’s action, and the board considered the decision of the fair-hearing panel before making its final decision to transfer the oncology program to Seton Medical. The evidence clearly establishes that Providence acted in accordance with the medical-staff bylaws and with its corporate bylaws in providing the RTO physicians with due process and in considering the fair-hearing panel’s decision before making its final decision. RTO and the RTO physicians did not present substantial evidence creating a genuine issue of material fact to establish otherwise.
As the Supreme Court of South Dakota recognized in Mahan v. Avera St. Luke’s, 621 N.W.2d 150, 158 (S.D.2001):
“Within its broad powers of management, some of the business decisions made by the Board [of the hospital] will undoubtedly impinge upon matters that relate to or affect the medical staff of the hospital. This fact is unavoidable. However, merely because a decision of the Board affects the staff does not give the staff authority to overrule a valid business decision made by the Board. Allowing the staff this amount of administrative authority would effectively cripple the governing Board of [the hospital]. [The hospital] would cease to function in its current corporate form if its staff were given such power.”
The trial court did not err in entering a summary judgment for Providence on this claim.
RTO and the RTO physicians also contend that the trial court erred in entering a summary judgment for Providence because, they say, a genuine issue of material fact exists as to the reason the board declined to adopt the fair-hearing panel’s decision. Specifically, RTO and the RTO physicians maintain that the board considered criteria other than patient quality of care, which, they say, were not related to matters presented to the fair-hearing panel. RTO and the RTO physicians assert that a disputed issue of fact exists regarding the board’s motivation for transferring the radiation-oncology services out of the hospital and to Seton Medical’s freestanding office practice.
The medical-staff bylaws provide that the decision of the fair-hearing panel is subject to review by the board. According to the bylaws, the board’s review of the panel’s decision, however, is limited “to criteria related to the quality of care and does not consider criteria unrelated to the criteria considered by the Fair Hearing Panel.”
Providence presented several examples from the record of the hearing in which members of the board stated that they had considered quality-of-care issues and other concerns raised during the hearing. For example, in his testimony at the hearing, *912 Providence’s chief executive officer, Clark Christianson, provided multiple reasons why the board’s transferring the oncology program would improve the quality of cancer care being provided:
“Providing central control over and simplified scheduling of all oncology services and facilities, thus enhancing efficient patient care.... ”
“Enhancing patient and physician convenience .... ”
“Providing efficient direction, control, and training of cancer program personnel to ensure that said personnel are available and competent to staff the cancer program consistent with good patient care.... ”
“The driving force behind moving forward was to create the kind of care environment ... both from a quality of care standpoint as well as generating the efficiency and effectiveness in the delivery of that care and to minimize the fragmentation that existed within the system as it was presently structured.”
Christianson’s testimony, which the board considered during its review of the panel’s decision, clearly establishes that the board considered quality-of-care issues when making its decision. Additionally, the resolution adopted by the board affirmatively states that its decision to transfer the oncology program was based “upon careful consideration of the criteria related to overall quality of care contained in the testimony, exhibits and other materials considered by the Fair Hearing Panel.” (Emphasis added.) In contrast to this evidence, RTO and the RTO physicians present only speculation and conjecture that the board’s review of the panel’s decision was improper. RTO and the RTO physicians have not presented substantial evidence that would create a genuine issue of material fact regarding the board’s consideration of the panel’s decision. Therefore, the trial court did not err in finding no disputed issues of fact as to this claim.
Finally, RTO and the RTO physicians assert that the trial court erred in entering a summary judgment because, they say, the transfer of the radiation-oncology practice to Seton Medical was a sham and that denying the RTO physicians access to the oncology equipment constituted a breach of the medical-staff bylaws.
First, although Providence and Seton Medical are related corporations, they are not, as RTO and the RTO physicians suggest, sister companies. The controlling shareholder of Providence is Ascension Health, whereas Seton Medical’s controlling shareholder is Seton Health Corporation of South Alabama, Inc. While Providence and Seton Medical are related companies, they do not have the same parent company; therefore, they are not “sister” companies. Consequently, RTO and the RTO physicians fail to establish that the transfer of the oncology program was a sham in this regard.
Moreover, the fact that the transfer of the oncology program from Providence to Seton Medical denies the RTO physicians access to Providence’s oncology equipment does not constitute a breach of the medical-staff bylaws. The transfer was completely within the board’s authority. See § 10-3A-34, Ala.Code 1975. Although Providence’s decision to transfer the radiation-oncology services out of the hospital adversely affected the RTO physicians, the corporate and medical-staff bylaws clearly establish that the RTO physicians do not have the power to overrule a valid business *913 decision made by the board, and the due-process hearing afforded the RTO physicians established that the board’s decision was properly based on its consideration of patient quality of care. RTO and the RTO physicians did not present substantial evidence to establish otherwise.
TV. Conclusion
Reviewing the record in a light most favorable to RTO and the RTO physicians, we conclude that RTO and the RTO physicians did not present substantial evidence to establish a genuine issue of material fact and that the trial court therefore properly entered a summary judgment for Providence. The judgment of the trial court is affirmed.
AFFIRMED.
NABERS, C.J., and HOUSTON, SEE, BROWN, and JOHNSTONE, JJ., concur.
HARWOOD and WOODALL, JJ., concur in the result.
LYONS and STUART, JJ., recuse themselves.
HARWOOD, Justice
(concurring in the result).
I concur in the result reached by the main opinion. I assume, without needing to decide, that the medical staff bylaws (“MSB”), upon their adoption by the board of directors (“the board”) of Providence Hospital (“Providence”), created a mutually binding agreement between the medical staff of Providence and the board. I further assume, without needing to decide, that the actions taken by the board that are at issue in this case served to trigger the rights of Dr. Ken Ellingwood, Dr. Greg Cotter, and Dr. Rod Krentel (“the physicians”) to the due-process procedures spelled out in the MSB. Providence contests both of those propositions, but my resolution of the physicians’ ultimate issue on appeal obviates the necessity for a definitive resolution of those foundational issues.
The physicians’ premises for those foundational issues proceed as follows: the preamble to the MSB states that the bylaws “when adopted by the board of directors, create a mutually binding agreement between the medical staff and the board of directors which may not be unilaterally amended.” Article VII of the MSB, “Hearings and Appellate Reviews,” provides that any member of the medical staff against whom certain “adverse actions” are recommended is entitled to the protection of specified hearing and appellate rights; among the adverse actions invoking such rights is the “involuntary reduction of current clinical privileges” of a member of the medical staff. Clinical privileges, in turn, are defined by the MSB as “the permission granted to medical staff members to provide patient care and includes access to those hospital resources including equipment, facilities and hospital personnel which are necessary to effectively exercise those privileges.” A member of the medical staff affected by a recommendation of adverse action may request a hearing, with the result that the medical executive committee must appoint a fair-hearing panel. Following the hearing and the panel’s decision, “either the member or the medical executive committee may request an appellate review.” However, “[i]f ... appellate review is not requested ... [the] action or recommendation [of the fair-hearing panel] may be affirmed or denied by the board of directors as the final action provided the board limits its consideration to criteria related to quality of care and does not consider criteria unrelated to the criteria considered by the fair hearing panel.”
The physicians contend in their brief to this Court that the board “violated both *914 restrictions,” in that it “considered economic criteria, increased market share, etc., which are specifically in addition to and inconsistent with considerations of quality of care,” and considered criteria unrelated to the criteria considered by the fair-hearing - panel. Consulting the portions of the record to which the physicians cite in support of those charges, I do not find the record to contain substantial evidence to support the physicians’ contentions. The physicians rely principally on the deposition testimony of Dr. Adrien Bo-det III, a member of the board, asserting in their brief that he “specifically testified that in making the ultimate decision to transfer the radiation oncology equipment, the Board considered all the materials and matters that had been previously presented to the board.” A careful reading of the portions of Dr. Bodet’s deposition testimony on which the physicians rely, in the context of the entire 130 pages of his deposition, does not bear out that contention. The physicians cite Dr. Bodet’s affirmative answer to the following question: “Was the discussion of the dysfunctional relationship [between the medical oncology staff and the radiation oncology staff] true from the beginning of the process looking at the cancer program to the end?”; as well as his affirmative response to the question whether the fact that Dr. Cotter was treating referral patients at another facility was “a concern throughout the entire process,” with regard to whether there should be an exclusive radiation provider at Providence. Similarly, the physicians point to Dr. Bodet’s affirmative answer to the question whether it “was a goal [of the hospital administration] at the beginning of the process and a goal at the end of the process” to provide for a radiation oncologist who would practice exclusively at Providence.
When considered in context, “the process” referenced by the questions was the approximately two-year process during which the hospital administration and the board, with the assistance of its consultant, Cancer CarePoint, were studying the oncology program at Providence. The references in the questions, taken in proper context, cannot be construed to extend beyond that “process,” so as to encompass the May 25, 2001, review by the board of the record compiled before the fair-hearing panel and the panel’s decision.
Also and lastly, the physicians reference in their brief to this Court the following deposition exchange between their attorney and Dr. Bodet, concerning the May 25, 2001, board meeting and the resulting resolution denying the decision of the fair-hearing panel:
“Q.... One of the issues discussed there was the question of affirming or denying the decision of the fair hearing panel?
“A. Yes.
“Q. And you were present at that meeting?
“A. Yes.
“Q.... Feel free to read whatever, but I’m going to ask you about the first whereas clause on page two.
“A. Okay.
“Q. It says, Whereas the decision by the Board to transfer the radiation oncology equipment to SMM’—
“And that’s Seton Medical Management; correct?
“A. Correct.
“Q. —‘was not made without considerable deliberation.’ You have to get through the double negative there. But what do you — was that discussed, that there was considerable deliberation pri- or to the decision to make the transfer?
*915 “A. We had been deliberating these issues for years. So considerable deliberation was given.
“Q. And all of the issues that we have been talking about through the years were still present?
“A. Pretty much.
“Q. Were those issues discussed, any of those issues discussed?
“A. You mean again specifically at that one meeting?
“Q. Yes.
“A. I don’t recall.
“Q. Okay.
“A. But I think that the sense that was being offered here is that we’ve been trying to work through this for years. “Q. All right.
“A. Much deliberation.”
The main opinion sets out one of the preamble “whereas” clauses of the board’s final resolution, and the “be it resolved” substantive portion of the resolution, but the above-quoted questioning of Dr. Bodet referenced another of the six “whereas” clauses, which, in turn, related back to the initial January 2001 decision of the board to transfer the oncology program to Seton Medical Management. Immediately following the “whereas” clause referenced by counsel in his above-quoted question to Dr. Bodet, is the “whereas” clause stating that “the decision by the Board [i.e., the January 2001 decision] was made after considering numerous alternatives over two and one-half years.... ” Placed thus in context, Dr. Bodet’s answers relate to the “considerable deliberation” leading up to that decision, and do not address the deliberative process undertaken at the May 25, 2001, special board meeting. In fact, another of the whereas clauses preceding the “be it resolved” text of the resolution expressly acknowledges that no appellate review having been requested, the MSB provided that the action or decision of the fair-hearing panel “ ‘may be affirmed or denied by the Board provided the Board limits its consideration to criteria relating to quality of care and does not consider criteria unrelated to criteria considered by the Fair Hearing Panel’.... ”
Accordingly, I cannot agree with the conclusion drawn by the physicians in their brief that Dr. Bodet testified that “in making the ultimate decision,” i.e., the May 25, 2001, decision, the board considered, for the purposes of making that decision, matters prohibited by the provisions of the MSB governing review of an action or decision of a fair-hearing panel.
Although the physicians argue that the board considered “economic factors” not related to quality of care in reaching its final decision, I do not find that argument persuasive. The physicians point out in their brief to this Court that Providence is accredited by the Joint Commission on Accreditation of Healthcare and Providence points out in its brief that the Joint Commission defines “quality of care” as follows:
“The degree to which health services for individuals and populations increase the likelihood of desired health outcomes and are consistent with current professional knowledge. Dimensions of performance include the following: patient perspective issues; safety of the care environment; and accessibility, appropriateness, continuity, effectiveness, efficacy, efficiency, and timeliness of care.”
The physicians’ own expert on medical-staff bylaws conceded that some economic issues are subsumed within the definition of “quality of care” and that the economic viability or vitality of a hospital could have a direct bearing on the quality of care that the hospital could offer. Thus, the term “quality of care,” under the record compiled in this case, is broad enough to en *916 compass many factors, some of which have economic implications as they relate to the ability of the hospital to deliver, and the efficiency of the delivery of, patient-care services.
Having considered all of the portions of the record to which the physicians refer in arguing that the board failed to limit its consideration to criteria related to quality of care and criteria considered by the fair-hearing panel, in reaching the board’s May 25, 2001, decision, I do not find substantial evidence creating a genuine issue of material fact on those issues. Accordingly, I cannot agree that the board violated the due-process rights of the physicians.
To the extent that this rationale proceeds beyond the terminus of the rationale expressed by the trial court in its summary judgment, such extrapolation is permissible. This Court can affirm a judgment of a trial court “if it is right for any reason supported by the record.” Taylor v. Stevenson, 820 So.2d 810, 814 (Ala.2001).

. Today, in the Mobile County and Baldwin County area, three of the major hospitals— Providence Hospital, Springhill Medical Center, and Thomas Hospital — do not provide radiation-oncology services in the hospitals. Those services are instead provided in freestanding physicians' offices located on or adjacent to the campuses of the respective hospitals. The RTO physicians own and operate the freestanding office-based cancer-care centers on the Springhill and Thomas campuses, where they provide both radiation-oncology and medical-oncology services.

. The members of the fair-hearing panel were members of the medical staff at Providence. They were appointed by the president of the medical staff.